We'll hear argument this morning in Case 20-1263, Gallardo v. Marstiller. Mr. Gowdy? Mr. Chief Justice, and may it please the Court, Medicaid provides a benefit to persons needing medical care. It is not a loan to be repaid later. The anti-lien and anti-recovery provisions, part of the original 1965 Medicaid law, reflect this policy by prohibiting states from taking any property belonging to a beneficiary, including her third-party liabilities. But in 1968, Congress, in subparagraphs A and B, established a limited pool of third-party liabilities from which a state could seek reimbursement for Medicaid expenses. States were directed, and I quote, to ascertain the legal liability of third parties to pay for care and services available under the plan and to seek reimbursement to the extent of such legal liability. A liability for future medical expenses does not pay for care available under the Medicaid plan, and thus is not part of the pool of reimbursement funds. The procedural tools enacted by Congress after 1968 did not change the pool of reimbursement funds. To the contrary, subparagraph H confirms that a state acquires only a beneficiary's rights to third-party payments, and I quote, for health care items or services furnished to the beneficiary. Finally, Florida's isolated reading of the assignment clause cannot be right because it forces beneficiaries to make lifetime assignments, leading to absurd results that convert Medicaid from a benefit to a loan. Counsel, the limitations that you would apply in this case to the assignment, would you also apply it to child support? They apply the same, Your Honor. However, child support works differently than a tort recovery. Child support normally requires ongoing payments to cover all of the child's medical care. A tort payment is a one-time payment for limited medical care that was caused by the tort. I understand that, but you said that the provision you're talking about, the assignment provision, is very broad. It doesn't have these built-in limitations. And I will take — I will also agree that perhaps child support is very broad in a different way. But you said that the — and they appear generally in the same part of the statute, but you say that the provisions that you mentioned restrict the assignment, the broad assignment language. Why doesn't that also apply to the child support language? Your Honor, the analysis would still be the same, whether it's child support or a tort recovery. The analysis would be that the medical care — and I said yes when you said it's very broad — but the medical care mentioned in the assignment clause, in our view, when read in the whole text, is shorthand for medical care covered by Medicaid, furnished by Medicaid, paid for by Medicaid. And, therefore, the analysis will be whether the third-party liability covers the same care, service, or item covered by Medicaid. And my point about distinguishing between tort recoveries and child care is tort recovery does — often pays for items, care, and service not covered by Medicaid. For example, if you're a disabled person, you will need a special vehicle with medical equipment to be transported to your appointments. Medicaid does not cover for that, but a tort feeser may have to pay for that. Child care, I think, is different in the other regard in that child care requires the parent to pay for all medical care, whether it's covered by Medicaid or not. And, therefore, I think it will operate differently in that context than in the tort recovery context. Thank you. I'd like to turn back to the third-party liability provision, if the Court doesn't have any questions. The Solicitor General has correctly stated this is the anchor or main provision that sets a state's general duty to reimbursement. And to quote a little bit more than I did in my opening, in subparagraph B, it says, where such a legal liability is found to exist after medical assistance has been made available, the state will seek reimbursement for such assistance to the extent of such legal liability. This language in the 1968 provision that establishes the pool of reimbursement funds clearly indicates that it is for third-party payments for medical assistance already provided by Medicaid, already incurred. And the last phrase in subparagraph B refers to such legal liability, which is cross-referencing the phrase in A, pay for care and services available under the Medicaid plan. And as my hypothetical with Justice Thomas mentioned, many of the items, services, and care that a tortfeasor must pay for, whether we're talking about past or future medical expenses, are not covered by Medicaid. So read sensibly, the third-party liability in A and B must be for the care, services, or items that have been made available by Medicaid to the beneficiary and can't be for future medical care items or services that may never be made available by Medicaid to the beneficiary. Mr. Gowdy, I guess I'm not quite sure why you read this language to pay for care and services available under the plan, why you necessarily read that as precluding payments for future expenses. I mean, couldn't we just read that as saying something like, you know, there are kinds of medical care that are available under the plan, and regardless whether they're past or future, those are the kinds of things that are covered. And then there are kinds of medical services that are not available under Medicaid, and so that would not be covered. But why is it a future-past distinction to have language like available under the plan? I would think it's just a kind of service distinction. Right. And I understand Your Honor's reading of that, but we don't believe that's the most sensible reading in the entire text of all these provisions. First, I would note that a dictionary definition of available is present or ready for immediate use. And given the context here, especially how available is used in the immediately subsequent subparagraph, have been made available, we believe that it makes most sense to be talking about services that have been incurred or provided. That also lines up with subparagraph H. Right. I mean, you definitely have, I mean, sort of the way I read these three provisions, like H is for you and K is for Florida. And then there's a little bit of a, and then I think A is harder, but I guess I'm wondering why I shouldn't basically read it. I'm not sure if it's really quite Florida's way, the alternative that I'm proposing. I'd like to ask General Whitaker about that. But why is, I would not think that this language makes a distinction between current, between past and future payments, as opposed to payments for things that Medicaid covers and payments for things that Medicaid doesn't cover. There are some things that we know that Medicaid is not going to cover, and those are kind of read out of this provision. Right. Well, first, we would agree with the government's position, the focal point should be on what Medicaid pays for or covers. And so you can have the same issue come up as it did in the Doe case out of Vermont for past medical expenses. Our context in this particular case, in many cases, is future medical expenses, which, in our view, are never available under Medicaid. And I would give two reasons for that, Your Honor. First, you have to know the financial circumstances of the individual. And many persons who receive a tort recovery become immediately ineligible for Medicaid. So until we know the moment in time that the medical care is administered and you look at that person's financial situation, you don't know if Medicaid is available. Two, you have to know the person's medical condition. Even if someone receives a future medical expense award because of the confines of a tort lawsuit, a jury has to make a prediction about the medical care that a person will need in the future. But as we know, sometimes people have more rapid recoveries. Sometimes things get worse. And then at that point in time, when the medical care is needed, is when the availability determination has to be made. What happens if a person who receives a tort recovery continues to be eligible for Medicaid and continues to have medical bills paid by Medicaid? That does happen in some instances, doesn't it? Am I right on that? And if I am, would you say that Medicaid cannot recover for those expenses from the portion of the tort recovery that was allocated to future expenses? Yes, you're right. People do remain on Medicaid after the tort recovery, and especially it happens as it does in this case with disabled children because they have what's called a special needs trust, which is discussed in the AAJ amicus brief. To answer your second question, no, the state may not recover from the future medical expense award. And there are really two reasons for that. The moment of the tort recovery, that becomes the property of Misc. and is protected by the anti-lien provision, and unless the state can point to an exception in one of these third-party provisions, it is protected. And secondarily, though, I would say the state is in what we say really the assignment provision, 1396K. It does two primary things, Your Honor. One, it granted the state the right to control the beneficiary's cause of action for medical damages paid by Medicaid and to demand the beneficiary's cooperation in that action. Florida would have the right, if it was concerned about lifelong care for someone like Misc. they could sue the tortfeasor themselves and try to set something up similar to a worker's compensation system where you have ongoing payments. But why does that regime make sense? Why should Medicaid not be able to recover for expenses that were covered by the tort recovery, the portion of the tort recovery for future medical expenses? Why does that make sense? Well, it makes sense, Your Honor, because at the moment of the tort recovery, we have to determine is this person, what is this property here? And just like today, you may be on a certain health insurance policy. If you lose your job tomorrow, you're not. And therefore, you will have to pay those expenses out of pocket. So there are many cases where the person receives the tort recovery and they're ineligible for Medicaid. But whether they're ineligible or not, the analysis has to be at the point in time of the recovery. And as far as what I suggested about a worker's comp scheme, if Florida or the states were to set that up, those often work where there's a determination that there's an injury that was in the course and scope of the employment, and then there could be future determinations where the worker's comp carrier has to make payments for future care. Unfortunately, the tort system is not set up like that, and liability policies aren't set up like that. There's a one-time payment. And therefore, we have to look at, just like with the damages that were discussed in Alborn with respect to lost wages, pain and suffering, we have to determine who has the ownership of those damages at the time of the tort recovery. Counsel, this is Justice Sotomayor. Yes, Your Honor. I want to break down what you're saying. You've been using, and so have we, the justices' past and future medical expenses. But the government makes it very clear that this is not about past or future medical expenses. This is about the statute, the amount that the Medicaid has paid, correct? Correct. And to the extent that at the moment of a tort recovery, the government hasn't paid anything, it's not entitled to recovery under the anti-lien statute, correct? Correct. And that's what Alborn said, which is the state is only entitled to what it's paid. And at the moment of recovery, that's all that it has a legal claim to, correct? Correct. All right. So as I understand your position as you've been discussing, is at the moment the lien is placed on a tort recovery, even at the time of an assignment, you can only be assigned what you have a right to, and they're claiming they have a right to all medical services. But the problem, any services, is they haven't given any services at that point, correct? Correct. So they can't have a lien for services at that moment they haven't rendered. Correct. All right. Now, with respect to Justice Alito's question, if I'm understanding you correctly, he's saying, why shouldn't we let Medicaid take? And your answer, I think, is we don't know what it's going to pay. If the recovery is large enough, the person can become ineligible for Medicaid, correct? Correct. Congress has given the right to take money that is given and place it in a trust for the medical care of the children, correct? If they are disabled, like Mr. Iardo, yes, correct. Exactly. And so that's what happens here. Correct. So it's not like that money is a windfall to her. It's being used to pay medical expenses. Yes, or like things for a van to get her to her appointment. Right. But the point is, it's not a windfall. No, and I would add that when Ms. Gallardo dies, all the money in the special needs trust goes back to Medicaid. Exactly. And so it's not like that the state is being denied anything. Correct. Now, with respect to the future support payments that Justice Thomas pointed to in this statute, as I read that, that's not an assignment of any kind. It's just an obligation for paternity to be established and the parent to be obligated to pay for medical care. It's not going to the state. Correct. That's right. All right. Thank you, counsel. Thank you, counsel. Justice Thomas, anything further? Justice Breyer? I thought I understood it, but I'm a little less certain. Suppose that Medicare is an accident, and Smith caused it. And as a result, Jones is in the hospital. His car was destroyed. He had some television set, which was destroyed. He may have passed. He will have passed bills and probably in the future, too, for his illness and health. My understanding was that the Medicaid, since he's on Medicaid, as of July 1, when we're all taking place, has paid already $25,000. And the question was, I thought, but you better correct me if I'm wrong, the question was, they'd like to get this $25,000 back. And it's Smith, the causer, who has settled with the victim, where they think they can get some of the money. And they get some of the money because $10,000 was set aside in the settlement for past expenses. Right? Right. And there is another $15,000 in past expenses that Medicare has paid. And now they'd like to get that back, too. Correct. But they can't get it back from that part of the settlement that's to pay for the television set. Correct. They can't get it back from that part that is to pay for the automobile repairs. Correct. But there is a little bit here, which let's say says $20,000 or $30,000, which is to pay for medical expenses, and it doesn't say whether it's past or future. So what Florida would like is to get back some of its past expenses from that portion of the settlement, which seems earmarked for future expenses. Correct. That's what's going on. That's what this issue is, is it not? Yes. And one problem for you is the statute says it can, that statute. But the other four statutes seem to say, look, you are supposed to get back from the settlements that which is earmarked for past. You're not supposed to get back money earmarked for paintings or cars or television sets. But only that part for past. And it doesn't say a damn thing about your getting money. In fact, it suggests the contrary of those four. Money from that part which is future. I don't know why Congress wrote it that way. They might have written it that way because they thought a lot of people fall off Medicare. And by the time they get future, they won't even be Medicare people. Or they might have written it because future payments are uncertain. But that's how they wrote it. Right. So you're saying, hey, there's no more reason here. Now I'm back to Justice Kagan's question. That language in the last bit seems against you. I understand that's the weak point for us. But I think you kept saying Medicare. I meant Medicaid. I wanted to point your honor, though, to 2651, which is in the Medicare statute, which does precisely what Florida really wants. And that statute allows Medicare to collect from the entirety of the tort recovery. And that makes sense sometimes. And Congress did that in 2013 with Medicaid and then nullified it in 2018 because it makes sense to have the third party responsible for the tort to pay for all the medical care caused by the tort. But actually, Florida's reading, what I said at the beginning was absurd. I know I have to answer your question. I hope I'm doing that. But what I'm saying is that it's actually far broader, Florida's reading, than what 2651A does. It allows a lifetime assignment and would require third parties who are future health insurers or future tort feesers who did not cause Ms. Gallardo's injury to pay for the care that Medicaid paid for her injuries. It's complicated. But I suppose if Congress is saying this to Medicaid agency, Medicaid agency, you want to get back the future payments. Here's what you do. Sue the tort feeser yourself. Exactly. And I would just say that Florida has pointed to these other provisions, but none of them do this future lifetime assignment. And so that's why, in our view, that's just not a sensible reading, Your Honor. Justice Alito, anything further? Justice Sotomayor, anything further? No, thank you. Justice Kagan? Justice Gorsuch? Fair to do, Chief. Medicaid is generally a statute about funding from the federal government to states. And if in the normal course we'd have a case about this, you might think of it between the federal government and the states. Say the state violates the anti-lien provision and the federal government stops paying. That case would have a very different light to me. And it would raise federalism questions. Medicaid is a huge percentage of state budgets. We'd normally require the federal government, before it does something that drastic in our federal system to a state, to speak pretty clearly. This case has a different light because we have an individual suing under 1983 to protect torque compensation. But I wonder whether that premise that an individual can sue under 1983 is correct. I just don't know. I know Florida has forfeited the issue in this case, and you're going to tell me that. I won't now. You can. People do it all the time. You can tell me again. But a number of states have written to us saying, gosh, be careful about deciding this case on that premise because it may not be correct. Do you have any thoughts for us about that? First, I'd say if you want to avoid the question and the opinions of those states, you can argue that. I knew it was coming. But I do have a thought that 1396PA1, which is the anti-lien provision and the anti-recovery provision in B, are clear. They're clear. And they are rights for individuals. They're not rights the federal government is likely to assert because it's Ms. Gallardo who will lose her property and be unable to pay for care that Medicaid doesn't pay for. I understand that. It was a legal question, though. What in the statute makes you think that it's a right that belongs to individuals rather than the federal government? Because the statute, by its plain text, says no lien may be imposed against the property of any individual. So it is her individual right that she has a right to assert here or in the lower federal courts. And furthermore, I believe it's clear. And the only condition here that is happening is it's not like the state is – I know you have other cases where the state must do A, B, and C to receive federal funding. But here, that condition that I just read is clear. And what we're arguing about is whether the state can go seek some other money. And the federal government is telling them they can't. But anyway, to directly answer your question, if you don't allow individuals to assert this right in federal court, it's effectively lost because it's the individual's – it's a statutory property right. Very helpful. Thank you. Justice Kavanaugh? To the extent that one provision, as Justice Kagan said, is helpful to you and one provision is not helpful to you, I want to ask you why we shouldn't look to the Medicare analogy that you were discussing with Justice Breyer as a sensible landing point for us to arrive at in resolving the discrepancy between the two provisions. What's different about the Medicare? Well, so the Medicare statute – Not the language, but what would be wrong with resolving this and treating it in the same way as Medicare, given that you have assumed for the second contradictory provisions? Well, I don't – I guess the premise of your question seems to be – and correct me if I'm wrong – that the language in the assignment clause is similar to the language in the Medicare statute. And I think the premise is that that language just is not helpful to you and other language in a different provision is helpful to you. So we have to sort out how are we going to figure out which provision to follow. And if Medicare is done one way, what sense would it make to have Medicaid done a different way on this issue? Well, I have two responses. One, you could follow the path of Judge Wilson in the dissent in the Utah Supreme Court in Latham and you apply the general specific canon and the most recently enacted canon. And we've argued that and we get the same point from Ms. Gallardo. Number two, Medicare and Medicaid are very different. Medicare, generally, you become 65, you're eligible and you're eligible. The rest of the time, you're here on the earth. Medicaid, you frequently see people going in and out of Medicaid and it actually happens in tort cases a lot. You'll have somebody who, when the tort happens, is on private insurance, then loses their job, can't make the COBRA payments, and by the time you get to trial, they're on Medicaid. And so you have – that happens where I was talking with these past payments. You have some paid by private insurance, some paid by Medicaid. And then they get the tort recovery and they're off. So there's a real distinction between Medicare and Medicaid in that regard. And so I don't think you can just apply Medicare. And, again, Florida's reading is a lifetime assignment. It's not the same as Medicare. The Medicare statute limits the recovery to the tort feeser. And though Florida says its current statute doesn't allow this, its reading of the assignment clause necessarily means that future third-party payers who didn't cause the tort must pay for the past care caused by the tort. Thank you. That's helpful. Justice Barrett? So, you know, as several people, including Justice Kagan, have said, 1396K-A1A favors Florida, and the later-enacted 25H is better for you. I think your case would be a lot harder if you just had 1396K to go on. And I'm just wondering whether there are any cases interpreting 1396K before the later 25H was enacted. We did, yes. If you look at page 40, give me one second, page 45 of our brief, you'll see cases there from the 1980s from state courts that were enacted before the 1993H provision. So I don't have any federal circuit court opinion. But could they construe it your way? That was the question. I'm just wondering whether when that was all there was, did the general interpretation of that provision favor you? Because that makes a difference, right? Otherwise, your argument really hinges on 25H having somehow narrowed the scope. I guess so. Historically, this is what I would tell you. Before the Alborn decision, which was in 2006, many state courts, including those in Florida, read these provisions as allowing the states to take all those things Justice Breyer mentioned a few minutes ago. So this issue about between medical care, you don't see come up in the litigation very much. Because what was happening at that time was, could we get the whole tort recovery, including the part for lost wages, pain, and suffering in the television? But what I would say about these cases on page 45 is that they basically apply background principles of subrogation, assignment, and insurance law, which the government and we have put in our brief, including in our reply brief. And those background principles line up with us. So that's the best I can do. I looked. I looked really hard. I didn't know you had. You're not going to find these cases from that time period because of Alborn happening in 2006, which kind of really changed the way a lot of the lower courts were looking at this. Thank you. Thank you, counsel. Thank you. Mr. Sherry. Mr. Chief Justice, and may it please the Court. Our position does not turn on any distinction between past and future medical expenses. It instead turns on who paid for those expenses. Medicaid is entitled to the portions of the recovery that correspond to the things Medicaid paid for, and the beneficiary gets the portions of the recovery that correspond to the things the beneficiary paid for. Justice Thomas, you asked about how this would work in the context of child support or medical support provided by a parent. Our answer is that it would work the same way. The same kind of allocation would have to be made. Justice Alito, you asked how this would work in the context of payments that are made after the settlement. I agree that's something that can happen, although it's unusual. And in that case, as I've said, we draw no distinction between past and future payments. The entitlement would turn entirely on who made the payment. Justice Kagan, you asked about the word available in A, and we agree that the word available can be read to mean theoretically available. But the key language here is not in A, it's in B. B is the provision that specifies the pool of funds from which the recovery can be obtained, and that's at the very end of B where it says to the extent of such legal liability. But if you look earlier in B, it says such a legal liability is found to exist after medical assistance has been made available on behalf of the individual. That makes clear that we're not talking about theoretical availability. We're talking about actually being made available. In addition, if you look at page 7A of our brief, there's a regulation, 42 CFR 433.138, which interprets A itself to apply to services that are furnished and not merely available under the plan. Justice Kavanaugh, you asked about the Medicare analogy, and I don't think that analogy really helps in this context. That's because Medicare adopts the system that was rejected in Allborn. In other words, it's not the case that Medicare takes the pool of money that is attributable to future medical expenses. Rather, it takes from the entire pool of the settlement. And now we think it's rational for Congress to have done one of two things. You could say you limit the government to the pool of money that corresponds to the funds that have actually been paid for by Medicaid, and that would be fair to the beneficiary. Alternatively, you could say that the government could take the entire settlement. That would be less fair to the beneficiary, but it avoids the administrative costs and hassle of having these allocation determinations. But what's less understandable is why Congress would have adopted the middle ground that Florida wants, where you have the administrative expense of these allocation proceedings, but you also don't have the fairness to the beneficiary because Medicaid is going beyond the pool that corresponds to the funds that Medicaid itself is paid for. In many ways, it's the worst of all worlds. Justice Gorsuch, you had asked about Section 1983 and how that would apply here. The federal government agrees that the court shouldn't reach that issue in this case. It's a difficult issue about how Section 1983 should be interpreted. There are also complications about whether it should be under Section 1983 or Ex parte Young. We'd urge the court to reserve that issue for future cases. Justice Breyer, your hypothetical involved Smith and Jones and Smith getting to pay, I think it was, $15,000 out of the $25,000. How does Medicaid recover the remaining $10,000? I think the way to deal with that is, first, the state could go after the tortfeasor directly. It has multiple avenues for doing that. It's received an assignment. It could use that assignment to bring the suit in the first place. Second, after the suit has been brought by the private individual, the state could intervene in that case. Third, after the settlement has been reached, the state could say, we're not a party to that settlement, and we still want to sue the individual for the remaining money. And in that suit, the state could ask for the full extent of its expenses. But what the state is doing here is it's not going after the tortfeasor. It's going after the victim of the accident, and it's seeking funds that don't correspond to the things it paid for. We think that's exactly what the anti-lien clause prevents the state from doing. If there are any other questions, I welcome them. Mr. Suri, I am curious as to, in these cases, this is a funding case, right? Why wouldn't you just sanction the state of Florida if you think they're out of compliance? Justice Thomas, we would be entitled to do that under a separate provision of the Medicaid statute. I appreciate that you have written in a separate opinion that is cited in Florida's brief, that that would be the appropriate sanction. The appropriate sanction wouldn't be preemption. But seven other justices disagreed with that proposition in that case, and we've gone with what the majority of the court has determined. That's also consistent with what the court held in both Allborn and Woese, where it rejected the state's efforts, even though the alternative of the federal government withholding funding was theoretically available. I guess that's why I would appreciate the government's effort to address my question, because if this is a spending clause case, predominantly, and a relationship between the federal and state government, we might expect the federal government to speak more clearly in prohibiting and limiting the state's powers than it has here before imposing a fine or maybe withholding Medicaid funds altogether, which is a huge percentage of state budgets these days. But if there is a personal right to action here, that puts the case in a different light. And I just want to make sure we're not addressing a unicorn that doesn't exist, but something that actually does exist in the world. And you tell us we don't have to decide it. I understand that. You don't need to tell me that again. But how would the government have us resolve that question? Does it have any views it wishes to offer on that? At the very least, Justice Gorsuch, even if the case couldn't proceed under Section 1983, we expect it could proceed under Ex parte Young. The state is taking an action that would be contrary to federal law, and the individual is entitled to bring an Ex parte Young case to say that action cannot proceed. Now, the argument on the other side, according to the state's amicus brief that you had cited, is that Ex parte Young wouldn't apply where Congress has implicitly foreclosed it, and they've relied on this court's decision in Armstrong. But Armstrong was a case in which the court said that the provision being applied was judicially inadministrable, and therefore you could infer that Congress meant for the secretary rather than individual lawsuits to be the mechanism to which that provision was enforced. That concern isn't relevant here. Counsel, this is Justice Sotomayor. The strength that was conceded by Petitioner's Counsel in K, I'm not sure I agree that K is a weakness for the petitioner. Are you in agreement with him? I will say only that K is the least strong of our provisions. I wouldn't say that it's weak. We have two arguments just looking at K alone. The first that we would say is there's an absurdity argument that results from Florida's position. If Florida reads K-A-1-A for all its worth and the way that Florida insists it should be read, which is with no contextual limitations whatsoever, then it leads to an absurd result of a lifetime assignment. For example, imagine that Ms. Gallardo were to miraculously recover tomorrow, and 10 years from now she has a slip-and-fall accident. If you take Florida's position to its logical conclusion, that's medical care, so Florida could look into the portion of the judgment that represents medical care for the slip-and-fall accident and use that to reimburse the car accident care that is provided here. In fact, it would be required to do that because this provision says a state plan for medical assistance shall. The other things we would look to in K are the language indicating that K does not stand alone, that K has to be read in context. This includes, for example, the opening words of K-A-A, for the purpose of assisting in the collection of medical support payments. That word assisting suggests that K is not some freestanding provision. It's meant to implement the preexisting duty in A and B. And Justice Barrett, if I could quickly address your question about the sequencing of the statute here, the order in which Congress enacted these provisions was first came A and B, then came K, and then finally came H. So we don't have to rely on H retroactively narrowing K, so to speak. We can just look at K being enacted against the backdrop of A and B, and if you agree with this on A and B, then K incorporates the same contextual limitation. And even if you don't agree with that, there are a number of opinions in which this court has said that a later enacted provision can clarify an ambiguity in an earlier provision. An example of that would be Justice Scalia's opinion for the court in the United States against Fausto. Go ahead, Justice Kagan. Mr. Suri, is there any argument here that K is more relevant than H or that H is more relevant than K, or do we just have to deal with the whole ball of wax together somehow? I'm afraid you have to deal with all of them together, Justice Kagan. We don't agree with the arguments that suggest that K is applicable but not H or that H is applicable but not K. And why is that? The reason is, first, that the court said in Allborn that these provisions echo and reiterate each other, and second, K has some features in it that would have to apply regardless of whether the government is proceeding under H or K or else the statutory scheme would not make sense. For example, there's a duty to cooperate in K that's not repeated in H, and if you treat these as two completely freestanding, unrelated provisions, then that would suggest that the beneficiary has no duty to cooperate under H. Similarly, K says that the federal government gets a share of the recovery. That's not repeated in H either, and I think we'd be quite worried if states could say we're proceeding under H and we don't have to turn over any money to the federal government. Question about the lifetime assignment absurdity. In your example, you talked about a tort settlement that came many years later and the state's still retaining a right and an obligation, indeed, to get money from that settlement to pay. Does that only work if the recipient is still on Medicaid? Not necessarily, Justice Barrett, because the assignment in this hypothetical would have been made at the outset when the Medicaid assistance were being received for the first time, when Medicaid is paying for Ms. Gallardo's injuries the first time, and presumably the assistance would last for the rest of Ms. Gallardo's life because Florida says there's no limiting language in KA1A. Counsel, in your list of what states could do to protect themselves, you didn't mention the fact that the state at all times has a right to challenge the allocation of a settlement if it believes the allocation with respect to past medical payments was unfair. It can judicially or administratively challenge that allocation, correct? I agree, Justice Sotomayor. That is an additional tool at the state's disposal that prevents these harms that the state is talking about here. Indeed, in this very case, the Eleventh Circuit took Petitioner to be arguing that the state was bound by the settlement allocation that the parties had privately agreed to, and the Eleventh Circuit rejected that argument. We agree with the Eleventh Circuit that to the extent Petitioner was making that argument, that argument would have been incorrect. The state is entitled to challenge the allocation. And again, the state doesn't have to limit itself just to the allocation. It can always sue the tortfeasor. To what extent does this issue implicate important interests of the federal government in the operation of the Medicaid statute? It does to some extent, Justice Alito, in the following ways. First, the federal government has an interest in recovering money. It gets a share of the state's recovery. But on the other hand, it also has a competing interest in protecting beneficiaries. As Mr. Gowdy said, Medicaid is not a loan. It's a benefit meant to be paid out. And the federal government has an interest in ensuring that states aren't, as it were, converting Medicaid into a loan that the beneficiary has been saddled with for the rest of her life. I understand that. I guess what I'm thinking about is why the federal government hasn't itself taken actions against Florida and any other states that have laws like this. For two reasons, Justice Alito, both textual. The first is if you look at A and B, they have the word reasonable in them. They provide that the state or local agency must take reasonable measures to ascertain the legal liability of third parties and that the state must pursue recovery when the reimbursement that the state reasonably expects to recover exceeds the cost of the recovery. So we think that leaves states with some wiggle room. And then the provision about withholding funds has, I think, the term substantial compliance. So it's not just that any footfault by a state would allow the federal government to come in and cut off funds. Rather, the state has to be not in substantial compliance with the statute. Finally, we wouldn't want to punish the innocent beneficiaries in Florida by cutting off the state's Medicaid funds if that can be avoided. Why would an individual have a right to then sue for what you call a footfault, but the federal government can only intervene when there is substantial noncompliance? The statute uses the term substantial in the provision authorizing the secretary to deny approval. It doesn't use the word substantial in this context. Isn't it awkward to think that the individual right would be broader than the federal government's? No, Justice Gorsuch. It may be that the federal government could itself have brought a lawsuit. It may not have been able to. I thought you just told us it probably couldn't have. Couldn't have cut off funds. That doesn't necessarily mean that it couldn't have brought its own lawsuit. Okay. Thank you. Justice Thomas? Just one brief question. Sorry. Addressing the preemption issue, normally when we have a preemption case, the federal government says do something one way. The state says do it another way, and there's a conflict. In this context, the spending clause context, we normally analogize that to an agreement between the state and the federal government. Do you see that there's any difference? I don't see how you could say the laws are in conflict when it is embodied in an agreement, as opposed to conflicting laws mandating certain conduct. Justice Thomas, the fact that a law is an agreement doesn't prevent it from also being a law with preemptive effect. Treaties, for example, are agreements, but they still have preemptive effect under the supremacy clause. Interstate compacts are agreements, but they have preemptive effect. And similarly, spending clause legislation, although it has been termed in the nature of a contract, they also have preemptive effect, as this Court has recognized many times. An example, if you'd like to look at a case, is Dalton against Little Rock Family Planning Services. I don't think treaties do you much good, but I see your point. Justice Breyer? For one minute, I'd like to go back to Justice Barrett's question. Everybody agrees we're talking about Medicaid has paid $25,000 medical expenses. We're only talking about what they paid. We're only talking about when the victim sues the tortfeasor. And Justice Barrett's question is, what can they collect that past expense from? And I think that she suggested that once upon a time, it was possible to collect it from the whole settlement. You could collect it from the television part, from the house destruction part, the car, everything. And then Congress narrowed it. And now you say they narrowed it to you can only collect from the part earmarked where that's fair, for past expenses. But the language says they've limited it down to anything in that settlement that has to do with medical expenses. And so what's wrong with that? Now, you made one point about future accidents and so forth. Forget that one. I understand it. I think you can get rid of that by saying it has to be this accident. But that's it. I've got that point. Anything else? Yes, Justice Barrett. First, your question assumes that we're looking at K alone, but K shouldn't be looked at alone. It should be looked at in the context of A and B, which it's implementing, and in the context of H, which the court in Albarn said it echoes. In addition, if you look at KA1C, it refers to a third party who may be liable to pay for care and services available under the plan. So there's, again, that same limiting language that's already in A, available under the plan. The same language is in K. A grant, it's not in the assignment provision specifically. It's in a different part of K. But it really wouldn't have made sense for Congress to say, beneficiary, you must assign the state your rights with respect to all medical care. But then you only have to cooperate with the state with respect to the subset of that medical care that relates to the services provided by Medicaid. It's more reasonable to infer that Congress meant those provisions to be harmonious and have a similar scope. Justice Alito? Justice Sotomayor? Counsel, is there any way to accept Respondent DeFlorida's reading without overruling, essentially, Albarn, the reasoning of Albarn? Justice Sotomayor, I don't wish to over-claim the relevance of Albarn. We think Albarn supports us in at least two respects. First, the bottom line result in Albarn. There was a settlement in that case where there was a portion, $35,000, that represented past medical expenses that the state had paid for. There was also an additional portion that represented future medical expenses that the state hadn't paid for. And the Court's bottom line judgment in Albarn was the state gets the $35,000, not the $35,000 plus the additional portion corresponding to the future medical expenses. Second, there's a footnote in Albarn, footnote 19, where the Court reasons that it would be unfair, unjust, to allow the state to obtain a portion of the recovery that it didn't compensate for. And we think that same unfairness arises in this context. But again, I don't wish to claim more of Albarn than would be reasonable. The issue that's presented in this case was not squarely before the Court in Albarn, so we wouldn't go so far as to say that it's a binding holding on that point. We just think it's reasoning supports us. Thank you. Justice Kagan? Mr. Suri, I'd like to ask you about an argument you didn't make, and it seems to me a good argument, the kind that I might ask General Whitaker about, but you didn't make it, and that makes me think it's a bad argument. So here's the argument. It's from 1396A25I, and that provision is sort of the mirror image of Kay because it's the requirement that insurers accept an assignment of rights. And that provision speaks very clearly about items or services for which payment has been made under the state plan. In other words, that provision seems to support your understanding of made payments. And as I say, it seems as though I should be the mirror image of Kay. But then again, you didn't make that argument, so why not? Justice Kagan, we made the argument at pages 18 and 19 of our brief. It's true I didn't repeat the argument at the podium today, but that's not because we don't think it's a good argument. It is just as strong for us as H, but I will note it was enacted after Kay, and so you'd have the same questions about whether H and I should be interpreted as narrowing a previously enacted provision. But we do agree it is very strong for us. Justice Gorsuch. Justice Kavanaugh. I think you said a minute ago that Florida's position would lead to an unfair, unjust scheme. But again, I want to compare it then. The Medicare scheme is even broader in terms of the state's ability to recover than what Florida is proposing for the Medicaid regime. And is that regime similarly unfair and unjust, or what's the explanation there? That regime sacrifices perfect fairness for administrative efficiency. That scheme allows Congress to say we don't want to bother with these allocation hearings. We'll just let the federal government take the full amount of the settlement. Now, Florida's scheme here that it proposes in this case wouldn't achieve that offsetting administrative advantage because you would still have to have the allocation hearings to determine whether a portion of the settlement is attributable to medical expenses or something like pain and suffering, which even they concede they can't recover. I think earlier you said that that would be the worst of all worlds, but in some sense it gives the beneficiary a little more than the beneficiary gets under the Medicaid regime, but gives the state a little more than it would get under Petitioner in your proposal. So why is that the worst of all worlds? It's the worst of all worlds because it neither achieves the administrative efficiency benefits of not having these allocation hearings nor achieves fairness. Now, I suppose you could defend that system by saying it's a compromise, it's a little unfair to the beneficiary and a little unfair to the state. Yes, I accept that in theory Congress could enact that system, but we just don't think that's the system Congress enacted here. And last question, how is this operating in practice right now throughout the 50 states, and what implications would occur if we adopt Florida's position and, by contrast, your position? In the 50-state survey we conducted before this argument, we uncovered nine states that, Glad I asked. by judicial decision or express legislation, do things the way that Petitioner would like. We identified six states that, in addition to Florida itself, that do things the way Florida would like, again, either by legislation or judicial decision. And most states were difficult to classify either because they said we will go to the maximum extent or they parrot the federal provisions and so you'd have the same interpretive dispute under the state law that you're currently having under the federal law, or they're otherwise ambiguous, or they haven't updated their statute since Allborn, so it isn't clear from the face of the statute what they would do now. I would note, however, that the vast majority of lower courts have come out in Petitioner's direction, not in Respondent's direction, so to the extent that's any guide, ruling for Petitioner would preserve the status quo in this area. Thank you. Justice Baird? Thank you, Counsel. General Whitaker? Mr. Chief Justice, may it please the Court. Medicaid is an important and expensive part of the social safety net. To help keep Medicaid solvent, Congress made Medicaid the payer of last resort, meaning that other available resources should pay medical expenses before Medicaid pays. As part of that role, Medicaid recovers money from tortfeasors who injure Medicaid beneficiaries. When it does so, Medicaid can never be reimbursed for more than it paid out in benefits. The question here is whether the program may seek that reimbursement from a tort settlement, not only out of medical damages for medical expenses paid in the past, but also for medical expenses that will be paid in the future. Section 1396K of the statute answers that question. It provides for Medicaid beneficiaries to assign to the program rights to payment for, quote, medical care, not past medical care, not some complicated subset of medical care. Medical care, period, including payments for medical care that may be necessary in the future. That reading is confirmed by subsection B of section 1396K, the remainder provision. Medical expenses may include expenses that Medicaid paid and expenses that the beneficiary paid. The remainder provision says that if Medicaid recovers all those medical expenses, Medicaid is reimbursed for its expenses and the remaining amount goes to the beneficiary. But if there isn't enough money to reimburse both Medicaid and the beneficiary, the remainder provision says that Medicaid gets paid first. In other words, far from prohibiting Medicaid from recovering out of all medical damages, section 1396K gives Medicaid's reimbursement claim priority over other claims to medical expenses. The result is neither untoward nor surprising. Medicaid can never be reimbursed for more than it paid out in benefits. Medicaid can also never receive any non-medical damages. But because it is the payer of last resort for medical expenses, it may recover from all medical damages. I welcome the Court's questions. General Whitaker, petitioner says that if we accept your interpretation of 1396, that you will be able to get or benefit from a lifetime assignment that covers third-party payments for future medical needs. What do you think of that? Well, I think it's not correct. It's not an implication or a position. It's not how Florida has implemented the statute, and I think that Florida's implementation of the statute is correct. In Florida, the lien can attach only to an injury for which Medicaid at least provided some payment.  For a different reason, I think, than some of the things we've been discussing today, I think the reason is it's natural to think of an assignment of a right that is being made in exchange for a medical payment to be related in some way to that medical payment. And so I don't think that would be within the scope of the assignment. Here, however, what we have is what everybody agrees is a valid assignment. And the only question is, does the state's payment for medical care extend to all medical care or only some medical care? But what about future medical care? He suggests that your reading would result in all future medical care. No, Your Honor, it does not result in all future medical care, consistent with Florida's result in the state being able to recover from all future medical care. What has to happen is if a Medicaid beneficiary is injured and Medicaid pays for it, Medicaid first seeks reimbursement out of the past medical expenses portion of the recovery. But if that amount is not sufficient to satisfy Medicaid's claim, then it may, if necessary, get the remaining part of the future medical expenses part of recovery. And finally, the distinction that the petitioner made between child support and medical care, what do you make of that? I don't think it makes any sense. The statute says that the Medicaid program is assigned rights to support that are for the purpose of medical care. If that payment happened in a lump sum amount that was for the purpose of medical care, the program would absolutely have a right to use that money to reimburse its costs. So I think that is actually quite strong textual indication that Section 1396K is not limited in the way that the other side suggests because the only example of a payment for medical care that we have in the statute does not fit their description of how payments for medical care that come from tort recovery should work. Thank you. Counsel, does the state ever participate in the underlying litigation that gives rise to the judgment or the settlement? Well, certainly Florida statute allows us that authority. In terms of our practice right now, my understanding is that we don't do that just because it's not cost effective for it to do it that way. Well, maybe not in every one, but if you have sort of ones where the amounts will be significant, that would avoid the allocation hearings after the fact and you can address those things in the structuring of the settlement or the judgment, right? Well, I'm not sure it would necessarily — well, I guess we would have an assignment for payment for medical expenses. That's presumably what we would be pursuing in that instance. Yes, Mr. Chief Justice, I think that's right. I mean, certainly we could bring these claims ourselves. I do think that in general it's more cost effective for the beneficiary to bring these claims because, of course, after Allborn, the state's assigned rights doesn't even extend to pain and suffering. So in most instances, the beneficiary is going to be suing anyway. Well, you don't have to bring the actions yourself. You could have a provision in the state regulations or law that you need to get notice of particular settlements or judgments that implicate either rights to recovery, and then you could at the outset, you know, protect your interests in recovering the future expenses. Well, that's right, Your Honor, and indeed our statute does require the beneficiary to provide notice. If we lose this case, though, there's a limited amount we can do to protect our rights because no matter how well we allow us to recover from future medical expenses. And again, we're only ever talking about recovering what Medicaid paid for in the past. Medicaid's claim is always limited to no more than what it paid for in the past. And with respect, the theme that my other side paints about, well, Medicaid can only get what it paid for. It just does not square with the language of the remainder provision, which expressly contemplates that the state can recover out for expenses that it did not pay for. And this court made that quite clear in Alborn itself. And this is what this court had to say in Alborn about the remainder provision. Counsel, if that's true, and you've just conceded that K, the lien created by K, is a lien on past medical expenses that have been paid, correct? That is absolutely true, Justice Sotomayor. All right, so I believe that the argument that the opposite side is making is if that's the amount of your lien, and you're saying that you are entitled to payment from any medical source, correct? For medical care from any third party. They're saying if you read that as broadly as you're claiming, that means that you're entitled to collect for that past payment from any medical care from any third party. Payment for medical care from any third party in the future, whether it's related to this injury or not. No, Justice Sotomayor, that does not follow, as I was explaining. I know, but the only way to not follow it is to break your lien from the source of the payment. Meaning here, the payment that was assigned to you, you're saying, included an assignment for future medical care. And what the government is saying is the payment that you're assigned is the payment for past medical care, period. Well, as I said earlier, I think there would be a question in other cases not presented here about what kinds of rights are within the scope of the assignment in the first place. And Florida has implemented its statute to say that an unrelated tort recovery would not be within the scope of the State's assigned rights in terms of whether the State has a right to payment at all. Well, put Florida's statute aside, because I think that the question that Justice Thomas and Justice Sotomayor are asking is what, in your understanding of the Medicaid provisions, would prevent a State from going that far? I guess I think the way I read the statute, Justice Kagan, is that let's say that a Medicaid beneficiary gets injured and has to incur medical expenses, and the beneficiary knows there's a tort recovery. I suppose I think that in theory, and I admit that this seems kind of unrealistic, the beneficiary could just say, I don't want to accept these medical expense payments. I want to take my chances and go after the tortfeasor myself and use that to pay the medical expenses. And that actually happened in a case not with regard to a beneficiary, but with a hospital that declined Medicaid reimbursement and actually decided to seek the third-party recovery itself. So I do think that in the statute there is a notion that the assignment concerns, when you're talking about assignment of a tort claim, and this is a common way of reasoning when you have conditions on the receipt of government funds, I do think that there is a germane requirement that when you're assigning a right to the State, specifically a right to a tort recovery, that it's not anything. It's something that is related to that payment. And that's not in any particular provision that you're seeing that. You're just seeing that in the very idea of what an assignment is? Yes. I think that's fair to say. And also just from the fact that it's a spending program. But look, all that I think is quite orthogonal to the issue we have here, because what we have here is what everybody agrees is a right that the State has to payment for medical care. The other side agrees that we can recover medical expenses, payments for medical care. And the only question is, does medical care also include future medical care? And it does. Here it only involves recovery from past medical care. The question is, what money can you collect it from? Am I right about that? Absolutely. Okay. So forget about collecting from the future. We're not talking about that. We're talking about collecting money earmarked for future payment in order to reimburse the State for past payment. That's absolutely true. Okay. So as I read these together, and please don't let me go off on some incorrect reading, because they're complicated. Part one. First rule in two provisions we haven't much talked about. Hey, the victim has got some money. You can't touch it. There's a no lien provision. There is a no whatever the other one is called. No, you can't touch it. No recovery, no adjustment, no recovery. You can't touch it, State. I don't care how he got it.  I overstate a little. But exception, exception. Now, the first thing that talks about exception is there is an exception for our past money. You know, Medicaid's paid already. And you can get back what it says is where that victim has right to payment for that thing you've spent by any other party for such, such healthcare items or services. That such clearly refers to you have a right from the tort feeser to payment for past. That's no more about payment right to payment for future than it is to a right about payment for balloons. That's no more about payment right to payment for future than it is to a right for payment in that part. Then you have the next part, which is yours. And the next part says, ah, but you should take an assignment. You can take an assignment, State, for payment for medical care from any third party. Here it doesn't say such. And so literally, you've got your case right in that language. And the only difficulty there is it certainly seems to conflict with the language I read just before it. Because we have a system that says, don't take any of their money. Then it says, take some of the money for the past stuff you paid, but take it only from they have money coming from a future guy, a victim, a tort feeser, for that. And then you have something say, take an assignment. So it seems to me you're asking us to read these two provisions, higgledy-piggledy, slightly in conflict. It's not direct conflict, at least hard to make consistent. And they're asking you, the government, to read them consistently with the whole spirit of the thing, which is leave the money with the Medicaid victim. That's a long question. And I'm really interested if I got the analysis right, not the conclusion, necessarily. There is no conflict, Justice Breyer, between those two provisions. Subparagraph H, which is the provision that you started out with about furnishing health care items or services, plays a different but complementary role in the scheme from 1396K. Congress added subparagraph H to the statute in 1993 to give Medicaid additional payment rights operating principally as against insurers who were evading the assignment provision in various respects. So 1396A, subsection A, paragraph 25, subparagraph H, and that's the provision you're referring to, is not in any way limiting the state's rights under an assignment. It is broadening it to make sure that Medicaid has an automatic right of subrogation when Medicaid makes payments. Just like Justice Kavanaugh, the way that the structure of the Medicare statute is exactly the same thing, because what you have in Medicare is you have a broad provision, 42 U.S.C. 2651, that gives the state broad authority to recover damages from tort feasors. But the most important point is that the Medicare secondary payer statute in 1395Y, 42 U.S.C. 1395Y, similarly talks about providing Medicare an automatic right of subrogation when Medicaid makes certain payments and a private insurer may also be on the hook for those particular items or services. And indeed, in the government report, which the United States cites as reflecting the reason that Congress added subparagraph H to the statute in 1993, they explicitly modeled it on the Medicare secondary payer provision. So there's no conflict. And, Justice Breyer, you mentioned four statutes. Well, I do think that we only need one statute to have authority here, so one is good enough. But the most important point is that in all the other provisions, apart from 1396K, that my friends rely on, the language they rely on is simply not present in 1396K. Can I follow up on 1396K and follow up on Justice Kagan's question? Because it seems that you're taking, and I don't mean to load it by saying this word, but a literal reading of 1396K, and the other side is saying, no, you have to read it in context of the other provisions and have it all make sense. And you say no, but then you're presented with the hypothetical, maybe the absurd hypothetical, but it is a hypothetical that's been raised, and you say, oh, well, there, don't read it literally. Actually, there, there's a germaneness requirement, and Justice Kagan asked you where that came from. So aren't you at least acknowledging that you get to context rather than just within the four corners of 1396K? Justice Kavanaugh, I'm happy to read it in context, and I have no quarrel with that. But whether or not that that contextual limitation that I was discussing from Justice Kagan is or is not in the statute, I think the important point is that the particular limitations that the other side would have you read into K cannot be right, because there are various other explicit indications in the statute that that is not what K means. And again, I spoke of the, you have the statute's remainder provision. You have the right to spousal support, which doesn't fit their theory at all. Again, rights to spousal support that are for the purpose of medical care does not fit their theory. And I think that the, so I think. Well, some of what you're just saying there answers another question I have, but I want to get more, which is suppose, and I know you disagree with this, but suppose we think H points one way and K against you, and K points a little bit in favor of you. How would you suggest we go about thinking about the resolution of that discrepancy or conflict? Well, I guess I do think that. I think you're saying you don't agree with the premise. Well, I don't agree with the premise, but I do think that, you know, the government talked about subparagraph A in paragraph 25 as being the anchor provision. I actually think that in this context, it is very much that 1396K is the anchor provision. And if you look at this Court's decision in Allborn, this Court's analysis of all of the third-party liability provisions was keyed off this key language in 1396K. So I think it's fair to say that this Court in Allborn actually treated 1396K as the anchor provision. So prioritize K is what you would say? I would say that, and I think that's supported by the fact that for 16 years before subparagraph H even existed in the statute, the only provision in the statute that spoke to the Medicaid program's payment rights was K. And it would be quite odd, I think, to say that Congress had just sort of forgotten for all this time to put this explicit limit into K, or worse still, to say that actually Congress sort of impliedly repealed K silently when it enacted H, not to restrict Medicaid's payment rights, but rather to take care of a specific problem that it was having with private insurers. And that, I think, Justice Breyer, is the explanation for why subparagraph H is worded slightly differently than K, because it is directed primarily at insurers who pay medical expenses for particular items and services, just like the Medicare secondary payer statute. What about the idea that no one was even thinking about this until Allborn? Do you want to contest that? In other words, we're parsing language from 77 and 83, but actually until Allborn, the other side said no one was really contemplating this precise issue. Well, I think that actually probably — that supports my position, actually, I think, quite strongly, because consistent with Justice Barrett's question, I think counsel's answer was, well, before Allborn, many states just assumed that they could get actually all — they could recover from all damages, even the TV, just as Breyer said. And Congress, no doubt, enacted section subparagraph H against that backdrop, knowing that the states had been administering the provision more broadly. And I think that supports quite strongly that Congress did not, in subparagraph H, silently overthrow — What's your best support for the idea that that was the baseline against which Congress was operating in 1993? Well, I don't have a specific case on me, Your Honor, but I do know that that was — I do think it's correct, counsel's statement. I can't point to a specific case right now, but I do think counsel's statement is correct. Do you agree that that was the understanding at the time? Well, it may not have — I mean, obviously, that helps you, but he can — It may not have been the uniform understanding. It certainly was the understanding of the Department of Health and Human Services, which, as this court noted in Allborn, had two administrative adjudications that dated from the mid-90s that basically interpreted the statute more or less to allow, indeed, require states to recover third-party liabilities out of all medical damages. And certainly, I also think that there — so, yeah. So I think that there are a variety of reasons why Congress enacted that. And if you look at the enactment of subparagraph H, it's very clear on the face of the amendment that created subparagraph H that Congress was intensely concerned with insurers because there are a variety of other amendments that Congress enacted at the same time specifically directed at insurers. Now, General, let's take a case which meets your germaneness requirement, that the future payments arise from the same injury or accident, all right? But let's say that the future payments are ones that the Medicaid program would not pay for. In other words, let's say the Medicaid program does not pay for certain kinds of home health aides or something like that. Are you saying that the state can also recover money for those services, services that, you know, to use the language of AB, are really not available under the plan? Not only could we do that, we could also do that, clearly, with respect to any past medical expenses that Medicaid had covered. Again, the remainder provision, I think, reflects that clearly a recognition, I think, that certainly at the past medical expenses, even if the beneficiary has incurred expenses out of pocket, Medicaid has priority over the recovery from those damages for all the medical expenses, not just... So where do you get that? Because AB really does say available under the plan. If this money is for care and services that are not available under the plan, how is it that the state can get that? I mean, then K is not only fighting H, then K is very much fighting AB, and not only the provision of AB that, you know, not only B, but also A, I guess, is the way I would say it. Sure, and I want to get to the point about where I get it from, which is the remainder provision, but to answer your question about A and B first... And the reason this is important, right, because AB comes first, right? And H, it might be this weird tag-along thing, but AB is first. I think as the petitioner in the opening brief noted at page 48, subparagraph A does not speak to what the state can recover in any... when it imposes a lien of this kind. All A says, as I read it, is Medicaid plans go out and find people who may owe money to the plan. It is not limiting in any way the scope of the state's recovery rights. Ditto for B, which simply, as this court noted in Allborn, cross-references the liability that subparagraph A establishes. So this notion that those provisions somehow limited the pool of... the state's pool of recovery all along since 1968, even though state Medicaid programs were merrily, apparently administering their programs all this time, to allow recovery for all damages... Basically, this is only a K case. And this is very different from, I think, the government's reading. Well, obviously it is. But this is only a K case. We should put aside H, and we should also put aside AB. I don't think you should put them aside. I think you should read them to not derogate from the state's recovery rights under K. And I do want to address one thing, because... Well, I guess what I'm saying when I say put aside is because the way I read not AB and not just B, which Mr. Suri says is stronger for his position than A, but really A, to pay for care and services available under the plan, and you're saying you can recover money even for care and services that are not available under the plan, and so you're saying K just stands independent of A as well as of H, and we should just put everything else in this statute out of our heads and just think about K. Not at all. The language that you mentioned in subparagraph A does not speak to this issue. And I think the operative words in that provision are not so much care and services available under the plan, but liability to pay for. And if you have, for example, a right of spousal support, which I think everyone would agree is a type of third-party liability covered by the statute, that right of spousal support for the purpose of medical care is available to pay for care and services available under the plan, even though the pool of money may have nothing to do whatsoever with any particular services Medicaid covered in the past. It's just money that is available to pay Medicaid's costs. That's what A says, and that's what B says, too. And Mr. Suri cited the language in subparagraph B that talks about in any case in which a legal liability is found to exist after medical assistance has been made available on behalf of the individual. That's just saying that's somebody who Medicaid provided medical assistance for. It's not limiting the state's pool of recovery in any way. And the only... What about the language at the end of B? Well, it says to the extent of such legal liability, which, as this Court noted in Allborn, is a reference to subparagraph A, which, as I was discussing with Justice Kagan, does not itself limit the pool of funds. All A and B are saying is go out and identify third parties' state Medicaid plans, and once you find them, recover to the extent they are liable. If you have a deadbeat spouse that owes child support, go out and get that money to recover for Medicaid's costs. That's all that provision... And I guess this just reflects that I'm not sure that I fully understand how it works in the context of spousal support or child support, because child support obviously isn't just for medical expenses. It's for clothing and maybe schooling and all kinds of expenses, feeding the child. So are you saying that the state can just go after the pool in an undifferentiated way? Certainly not, and that's because the assignment right applies to rights to support that are, quote, specified as support for the purpose of medical care by a court or administrative order. So we could definitely not get all of the support. We can get the support to the extent it is for medical expenses. So would there be an administrative hearing to allocate it in a similar way that there would be in a tort settlement? I'm not aware of that happening, Your Honor. I think it would have to be sort of a separate court order. It just seems very odd since that's not how, you know, you don't have child support. I would think in a normal course earmarked this is solely for medical expenses. Right, but it does happen sometimes as I understand it. I mean, most of the time what happens is that the spouse is ordered to just buy health insurance, but it can happen in other ways, too, as I understand it. But it does happen. Florida does treat rights of spousal support somewhat differently from unallocated tort recoveries to which the administrative proceeding applies. But I did want to address... Counsel, I'm afraid that I keep reading the child support section of this, and it doesn't work any kind of assignment. All it says is that a state plan for medical assistance shall provide that the person you're covering be required to cooperate with the state to establish paternity and to establish paternity and get child support. There's no assignment in it at all. But putting that aside, I'm a very simplistic person, okay? Under A, you say that the person is required to assign to you their entitlement to payment for past services only. You're not claiming that they have to assign to you payments for future care. So that's correct, right? Well, no, Your Honor, that's not quite correct, because I think that if Medicaid paid for an injury from which a tort recovery arose, then, yes, the assignment would encompass the right to payment for all medical expenses out of that. But that has been paid by you. Well, we could only recover... So are you saying that if you sued the tort feeser, that you would be obligated to sue for past and future expenses whether you're paying for them or not? Yes. But we obviously would always, in any case, be limited to recovering no more than we paid out in benefits. Exactly. So at the point of your suit, you could only recover from the tort feeser that which you paid, correct? No more than what we paid, but that wouldn't... Now then, let me stop, but you're also arguing, then, that you could sue also for future expenses that you don't pay? I think we could sue for all medical damages, which could include both medical expenses that Medicaid paid, it could include past expenses that Medicaid did not pay, and it could also include future medical expenses, which, as was mentioned... And that really then undoes A, B, H, and all of the provisions of the Act, correct? Oh, I don't think it undoes them at all. And just to answer your initial question, though, about the assignment, the assignment of support occurs in 1396 subsection A, paragraph 1, subparagraph A, which does, separately from subparagraph C, provide for an assignment of the right to spousal support. That seems extraordinary, that what you're reading into the statute, an anti-lien statute that permits you only to get an assignment of what you have paid for. Now you're saying the assignment under K is incredibly broader than that, whether you paid for it or not, whether you were required to pay for it or not, and future, that you're assigned the individual's entire rights. That's what you're telling me. Justice Sotomayor, the assignment is always limited by the maximum amount that Medicaid paid. If Medicaid successfully recovers all of the medical expenses, then Medicaid will get its claim for past medical expenses fully paid. And if there are also any future medical expenses, the beneficiary will get the remainder. Likewise, if the beneficiary paid any past medical expenses, the remainder provision says that the beneficiary will get those as a remainder. Does the beneficiary have to sue at all for past? I don't see anywhere in here. There's an assignment to the state. There's a subrogation by the state. But why should any of the recipients bother to sue for what you're going to be paid, if you're going to take it all anyway? We can't take it all under Alborn, Your Honor. Well, no, because you're saying to me that if the pot exceeds what you paid, there's no pro rata that's required at all, so why bother? I think that beneficiaries, even if we were able to recover from future medical expenses, would also have substantial incentives to still bring suit. Oh, yes, for pain and suffering, for everything else. But why bother suing for past medical expenses at all? They should just sue for future. Well, I think it's because under the remainder provision, they would, in essence, have the upside. So I think that they have an incentive both on the non-medical damages side and on the medical damages side, certainly, to bring suit. Thank you, Counsel. Justice Thomas? Just briefly, General Whitaker, I think I have this on. I asked Mr. Suri about preemption, and you heard his answer. Just a brief comment from you on what you think about preemption in the context of spending clause cases like this. Well, I think that there is a strong presumption against preemption, and as well in spending clause cases, to read spending clause statutes to impose obligations on the states that are not clear. But I think it's quite extraordinary for the federal government to read, apparently, all of the 87 paragraphs of the state Medicaid plan requirements in 1396 subsection A to sort of permit any beneficiary to argue that state law is, if so facto, preempted, which I would have thought the United States would have thought is inconsistent with the Secretary's enforcement authority. So it's an extraordinary position that they're taking, and I can't imagine that those laws are preemption. All of those provisions are preempted. And this Court did not so hold in Allborn or Vose. This Court only held that the anti-lien provision has preemptive effect. It certainly doesn't follow from that, that any state law that doesn't comply with any of the many state Medicaid plan requirements in subsection A of 1396a are preempted. Justice Breyer, anything further? Justice Alito? Justice Sotomayor? No, thank you. Justice Kagan? I would like to ask you, General Whitaker, about I, because I does seem as though it should be the mirror image of K. K is talking about an individual being required to make an assignment, and then I is talking about an insurer being required to accept the assignment. So you would think that the two would be phrased the same way, but they're not. I is phrased in a way that's very favorable to the other side, because it talks about an item or service for which payment has been made under the plan. So what are we to make of the fact that what should be a mirror image of K reads exactly the way you don't want it to? I don't agree that it reads exactly the way I don't want it. I think it actually supports our idea that the two payment rights in 1396k and subparagraph H are independent. And if you look at Romanette 2 in subparagraph I, and this is at page 3a of the government's appendix, before the mention of the assignment provision, it says, accept the state's right of recovery and the assignment to the state of any right of an individual or other entity to payment from any other party. So I think that recognizes that there are two different payment rights that are at work here, one established by K, because otherwise Congress wouldn't have talked about two different rights of recoveries, one stemming from, I think, subparagraph H, and the other stemming from 1396k. And it's not the mirror image at all, Your Honor, because subparagraph I, as I read it, clearly only applies to insurers. There's a question about whether H does, but clearly I applies only to insurers, because Romanette 1 talks about, imposes on insurance companies obligations to identify, to bring to Medicaid's attention when Medicaid beneficiaries have insurance coverage and the like, which would be nonsense as applied to anybody who is a potential tortfeasor, unless we're all insurers to everyone in the world. So I think that it is limited. And Mr. Suri said, oh, well, it doesn't make, H has no duty of cooperation. But I think the reason for that is because insurers have other applicable provisions that require them to cooperate with state Medicaid programs to help identify these liabilities, and I is a very good example of that. And I think it reflects, just like the story I was trying to tell with regard to H, that these provisions are directed at a different problem. And subparagraph I was enacted in 2005, because even after the enactment of subparagraph H, apparently insurers were still, as it turns out, they don't like paying money to Medicaid too much, and so they were doing other things to evade Medicaid's rights. And so Congress came along and enacted subparagraph I, but it didn't do any more than it did when it enacted subparagraph H, limit or enact something that was declarative of an existing limit in 1396K itself. Thank you. Justice Gorsuch? Justice Kavanaugh? In your brief, General, you note that Florida spends about $28 billion per year on Medicaid services, which is 30 percent of the budget. How much would you save, roughly, if you prevailed in this case? I've tried to get good numbers on that, Justice Kavanaugh. Unfortunately, I haven't been able to. It's certainly something that's important to my agency, and I know that it can result in a substantial difference in individual cases, as noted by the multi-state amicus brief, which touches on this issue. But unfortunately, I don't have great numbers on that, but it is important to Florida's Medicaid program. And second, Mr. Suri helpfully said that nine states do it petitioner's way and six states, I think he said, do it your way, and it was hard to tell with other states. Do you want to give your view on how the practice is? Well, I'd be interested to know how he came up with nine. That's different from the count we came up. I guess we couldn't compare notes before the argument. But we counted it as fewer. I thought that there were only five that we could find that explicitly allowed the recovery of future, and most of those were the result of state judicial decisions that said that they had to. I only thought that it was at most California and Vermont that had actually arguably done this on their own without some kind of judicial prompting on their own, but I have no reason to ‑‑ it's a little bit unclear, and obviously it's difficult to ‑‑ And that's my question. Why is it unclear in these five other states? Well, I mean, it's somewhat unclear because many of these statutes kind of don't speak to the issue, and a lot of the statutes have the following structure where they just say something like, the state has a lien up to the amount of medical assistance paid, and it doesn't really specify in detail how exactly the state can recover on that lien and the like. So there are some states that have explicitly said that you can recover future medical expenses. Massachusetts is one. Oklahoma is one. Obviously in Florida, Florida is one. But I could only ‑‑ so I do think that, you know, this court's decision is very much going to set the tone for the country on this issue, and, you know, state Medicaid programs are going to have to, you know, have a policy now, I think. Yes. Thank you. Justice Barrett? Yep. Thank you, counsel. Counsel, I'm sorry, Chief, just one question. Sure. Counsel, you just said that this decision will force states to change. Your reading will force states to do what you're doing, correct? Because they're obligated, you're saying, under the statute to collect from whatever sources they can. So what you're saying is those states who have contrary laws to yours or explicit laws to the contrary, they would be preempted. Well, I don't think this ‑‑ no, I don't think they would be preempted, Justice Sotomayor, because I don't believe that all of the state Medicaid plan requirements in subsection A of 1396A are preemptive. I do think you're certainly true, Justice Sotomayor, that the states would have an obligation likely to recover those third-party liabilities, although I agree with Mr. Suri that the statute does build in some flexibility for state Medicaid programs in seeking those recoveries and allows state Medicaid programs to weigh costs and benefits and only requires the identification of liabilities to the extent that it is reasonable. Thank you, counsel. Rebuttal, Mr. Gowdy? 1396K, Justice Kagan, you asked if it was inapplicable. We would say it is the least applicable. This provision authorized states to directly pursue third parties for medical expenses paid by Medicaid, and in doing so, it abrogated the common law rules against claim splitting and against the assignment of personal injury actions. And Florida has not exercised those rights in this case. The Chief Justice asked about is this ever used. It is occasionally in mass torts. You all may recall the tobacco settlements from the mid‑1990s. Those were cases brought by states against tobacco companies for past medical expenses paid by Medicaid. Generally, the states don't jump into individual lawsuits. But this provision gives them real force. But it's really the least applicable here compared to the other provisions we've been discussing today. And, Justice Kagan, you brought up the home health care, and, Justice Barrett, you brought up some questions about child care, and I would like to try to tie them together. The state's position here is a hyperliteral reading of the words, any rights to payment for medical care. Reading that hyperliterally, it's not just a future tort. It's a future insurance policy. It's a future parent who's ordered to pay for some type of medical care. And under the state's reading, even if that future insurance policy is paying for things or the parent is ordered to pay for things not covered by Medicaid, the state told you today they could take it. So, for example, if Ms. Gallardo's father was ordered to pay for the special medical equipment that she needs to get to her appointment that is not covered by Medicaid, the state's position is that they could take that money. And, finally, the state has danced around the other provisions, in particular, H. You've been told repeatedly it was primarily for insurers. The plain language says third party. The third party includes a tort feeser, and this court applied that language in Alborn. So it's not primarily for insurers. It's for this instance here, and it's directly applicable. And A and B, as we've indicated, which the state has not addressed in their brief, is for the legal liability of third parties to pay for care and services available under the plan. And we did point out at page 48 of our brief that there was certainly some confusion. We cite a case called White from New Mexico in 1974. There was some confusion about what that language meant by some courts. I see a man. Could I just conclude? Certainly. And H clarifies that without a doubt in our view. Thank you, counsel. The case is submitted.